1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                        CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  BEINER ENTERPRISES, INC. | Case No. CV 13-08723-AB (MRWx) |
| 11        Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE LIABILITY** |
| 12  v. | |
| 13  ADAM CALDWELL, INC. et al. | |
| 14        Defendants. | **TRIAL DATE: FEBRUARY 17, 2015** |
| 15 | |

16
17          This matter was tried before this Court, sitting without a jury, on February 17–
18   19, 2015.
19          Brook Carroll and Danielle Everson of Clark Everson LLP appeared on behalf
20   of Plaintiff and Counter-defendant Beiner Enterprises.  Mary Reiten of Terrell
21   Marshall Daudt & Willie PLLC appeared for Defendants and Counter-claimants
22   Adam Caldwell, Inc. and Jennifer Caldwell.
23          Having heard the admissible evidence presented by the parties, the arguments
24   of counsel, and the supplemental briefing, and having considered the demeanor and
25   credibility of the witnesses and all papers and exhibits presented by the parties for
26   purposes of this trial, including admissions in the Final Pretrial Conference Order, the
27   Court makes the following findings of fact and conclusions of law pursuant to Rule 52
28   of the Federal Rules of Civil Procedure.

1.

# FINDINGS OF FACT[1]

**A.**    **The Parties**

1.    Plaintiff and Counter-Defendant Beiner Enterprises, Inc. ("BEI") is a citizen of the state of Washington.  BEI's president and sole shareholder is Robert Lance Beiner ("Lance").  (Dkt. No. 95, Admitted Fact ("AF") 1, 3.)  Lance, the individual, is not a party to the instant litigation.

2.    Defendants and Counter-Claimants Adam Caldwell, Inc. ("ACI") and Jennifer Caldwell ("Jennifer") are citizens of the State of California.  Jennifer is the president and sole shareholder of ACI, a position she has held since November 2011.  (AF 6, 10-11.)

3.    Adam Caldwell ("Adam") incorporated ACI, a California corporation, in August 2004 and served as ACI's president and sole shareholder through November 2011.  (AF 7; Ex. 34.)

4.    Lance incorporated BEI, a Washington corporation, in December 12, 2005.  (Ex. 127.)

5.    Prior to incorporating BEI, Lance was the president of Beiner, Inc., a California corporation.  Beiner, Inc. dissolved and ceased to exist in December 2005.  (AF 5; Ex. 128.)  Beiner, Inc. is not a party to the instant litigation.

**B.**    **Background Regarding Gray Market**

6.    A "gray market" is defined as "a market employing irregular but not illegal methods; a market that legally circumvents authorized channels of distribution to sell goods at prices lower than those intended by the manufacturer."  (Merriam

---

[1] Following the bench trial, both parties filed and lodged proposed findings of fact and conclusions of law and responses/objections to the opposing party's proposed findings and conclusions.  (Dkt. Nos. 110-113.)  Where one party contested a proposed factual finding by the other party but failed to cite contradictory evidence or otherwise explain why the other party's cited evidence should not be credited, the Court disregarded the purported contention to the extent the contention was inconsistent with the Court's review and understanding of the evidence.

Webster's Online Dictionary, available at http://www.merriam-webster.com/dictionary/gray%20market; *see also* Trial Tr. at 32:24-33:7 (L. Beiner).)

7.     ACI currently operates in – and Beiner, Inc. and BEI used to operate in – the gray market for electric motor parts.  (Trial Tr. at 32:24-33:7 (L. Beiner); 279:2-8 (J. Caldwell).)

8.     The major vendors that supply electric motor parts to ACI (and previously supplied them to BEI) on the gray market are also original equipment manufacturers ("OEMs") that would sell parts to unauthorized distributors.  While this practice is not illegal, it may violate agreements between manufacturers and these vendors.  (Trial Tr. at 35:20-36:15; 38:6-39:8 (L. Beiner).)

9.     Vendor relationships such as these are valuable, and as a result ACI has always kept and continues to keep its purchases from these vendors confidential.  (Trial Tr. at 361:12-17 (J. Caldwell).)

10.     ACI keeps its customer lists secret for similar reasons.  (Trial Tr. at 288:19-25 (J. Caldwell).)

C.     **Creation Of ACI And BEI**

a.     **Beiner, Inc.**

11.     From 1991 through 2004, Lance owned and operated Beiner, Inc., which engaged in the purchase and sale of electric motor parts under the trade name B&B Electric Sales.  (Trial Tr. at 32:13-20 (L. Beiner).)

12.     Adam Caldwell ("Adam") and Jennifer Caldwell (née Shows) ("Jennifer") became employees of Beiner, Inc. in the early 1990s.  (Trial Tr. at 280:18-281:12 (J. Caldwell).)

13.     Lance taught Adam about the gray market business, and the two developed a close working relationship.  (Trial. Tr. at 49:17-22, 52:8-21 (L. Beiner).)

14.     When Jennifer began working for Beiner, Inc. (in approximately 1992 or 1993), she and Adam were dating; they subsequently married.  (AF 14, 16-17; Trial Tr. at 281:8-12, 323:11-14 (J. Caldwell).)

15.   Beiner, Inc. dissolved in December 2005.  (AF 5; Ex. 128.)

16.   Neither party adduced any evidence at trial that Lance, as an individual sole proprietor, ever engaged in any business using the trade name B&B Electric Sales following the dissolution of Beiner, Inc. in 2005.

### b.   Lance's Contested Divorce

17.   In 2004, Lance was going through a contested divorce in Washington State and sought to, and did in fact, minimize his assets to avoid having to share those assets with his soon-to-be ex-wife.[2]  (Trial Tr. at 233:19-21; 243:9-244:16 (L. Beiner).)

18.   As part of his effort to minimize his assets, Lance sought permission from the Washington state court to liquidate Beiner, Inc. and retire.  (Exs. 32-33.) Lance represented to the Washington state court that liquidation (as opposed to selling the company) was necessary because Beiner, Inc. had lost a key vendor and could no longer maintain the volume of sales it once enjoyed.  (Ex. 33.)

19.   Despite his representations to the Washington state court, Lance neither retired nor liquidated Beiner, Inc.  (Trial Tr. at 281:24-282:10 (J. Caldwell); 417:1-3, 417:21-23 (B. Gonzalez).)

---

[2] Though Lance denied this when testifying at trial, Lance did acknowledge during his deposition that he sought "to demonstrate that Beiner, Inc. ha[d] reduced income" during his divorce proceedings in 2004.  (Trial Tr. at 344:8-16.)  Testimony by trial witnesses Becky Gonzalez and Mike Ladiana supported Lance's deposition testimony, *i.e.*, that Lance sought to minimize the Beiner, Inc. assets in order to avoid relinquishing any of those assets as part of his divorce settlement.  (*See* Trial Tr. at 416:22-25 (B. Gonzalez); 466:22-467:13 (M. Ladiana).)  Additionally, Ms. Gonzalez testified that ACI began conducting business in October 2004, purchasing inventory from Lance in his personal capacity and re-selling that inventory to customers, and per Lance's instructions, Ms. Gonzalez did not post any sales for ACI or pay Lance for any purchased inventory until December 2005.  (Trial Tr. at 418:7-419:5 (B. Gonzalez).)  In light of this evidence, the Court finds that Lance's trial testimony denying that he sought to minimize his assets during his divorce proceedings is entitled to little weight.

20.     Indeed, Beiner, Inc. was not in danger of going out of business, even after it lost its vendor, because it still had 9-12 months of inventory on its shelves. Beiner, Inc. kept that amount of inventory as a contingency against losing a vendor. (Trial Tr. at 417:4-20 (B. Gonzalez).)

### c.     **Incorporation of ACI**

21.     In 2004, Lance approached Adam Caldwell and told him that he had feared for his health following a heart attack he suffered in 2000.  Lance told Adam that he loved him like a son, and in the case of his (Lance's) untimely death, Lance wanted to see that Adam was taken care of, and that Adam could continue in the business of gray market sales for electric motor parts.  (Trial Tr. at 43:23-44:23 (L. Beiner).)

22.     In or around August 2004, Lance asked Adam to set up a new corporation to facilitate this purpose and to, in practical effect, operate the sales arm of the gray market sales for electric motor parts business.  (Trial Tr. at 46:4-18 (L. Beiner); Ex. 34.)

23.     Adam incorporated ACI in August 2004 (Ex. 34), at or around the same time that Lance asked the Washington court to permit him to liquidate Beiner, Inc. and facilitate his retirement.

24.     Lance does not have, and has never had, any ownership interest in ACI. (AF 8, 10-12.)

25.     At the time he incorporated ACI, Adam contributed approximately $22,000 in capital.  (Trial Tr. at 420:24-421:25 (B. Gonzalez).)

26.     Neither Lance nor BEI (a company which was not yet in existence in 2004) invested any cash in ACI.  (Trial Tr. at 439:17-19 (B. Gonzalez).)

27.     At the time ACI was incorporated, Lance was under orders from the Washington court not to dispose of community assets.  (Trial Tr. at 238:25-239:3 (L. Beiner).

28.     Lance admits that the name B&B Electric Sales was a community asset and had value in 2004.  (Trial Tr. at 239:4-10 (L. Beiner).)

29.     Lance gifted the name B&B Electric Sales to ACI prior to finalizing his divorce in 2004.  In fact, according to ACI's recorded Fictitious Business Name Statement, ACI began doing business as B&B Electric Sales in 2004 (Ex. 35),[3] and Lance himself indicated that ACI owns the B&B Electric Sales trade name.  (Ex. 81.)

30.     Lance never notified the Washington state court overseeing his divorce proceedings that ACI was created, and Lance did not mention this fact during his divorce settlement mediation.  (Trial Tr. at 242:6-16 (L. Beiner); Exs. 32-33, 36.)

### d.     Incorporation of BEI

31.     Lance incorporated BEI in December 2005.  (Ex. 127.)

32.     BEI has never operated under the trade name B&B Electric Sales.  (Trial. Tr. at 245:2-17 (L. Beiner).)

### D.     ACI and BEI Were Engaged in a Partnership

### a.     Partnership agreement and structure

33.     Though no written agreement exists between them (AF 20), ACI and BEI, through their shareholders, orally agreed to form a partnership whereby ACI acted as BEI's exclusive sales agent, and BEI acted as ACI's exclusive vendor in the gray market for electric motor parts.[4]  (Ex. 39; Trial Tr. 215:2-5 (L. Beiner); 280:3-4, 282:22-283:10 (J. Caldwell).)

---

[3] BEI argues that the Fictitious Business Name Statement should be discounted because the statement was not filed until August 2009.  The Court disagrees.  BEI has not offered any evidence to contradict that ACI, in fact, began doing business as B&B Electric Sales in September 2004, and so the fact that the statement was filed in August 2009 is immaterial.  That Lance gifted the B&B Electric Sales trade name to ACI was corroborated by the fact that when Adam gifted his ACI shares to Jennifer – making Jennifer ACI's president and sole shareholder – Jennifer understood that this included ownership of the B&B Electric Sales trade name.  *See infra* Factual Findings Nos. 63-64.

[4] BEI's argument that BEI and ACI had an agency relationship whereby ACI

34.     As part of this partnership arrangement, BEI acquired inventory from vendors and then transferred inventory to ACI based upon customer orders.  ACI in turn shipped the inventory that was sold, collected customer payments, and paid BEI the cost of its inventory plus a "special markup," usually consisting of ACI's revenues minus operating expenses, including employee payroll.  (Trial Tr. at 59:3-14, 93:16-25 (L. Beiner); 280:3-7 (J. Caldwell).)

35.     The special markup was calculated based on ACI's monthly gross sales (*i.e.*, profit/loss statement), and it was not dependent on ACI's accounts receivables, retained earnings, or any other balance sheet entries.  (Trial Tr. at 434:18-435:20; 439:24-440:2 (B. Gonzalez).)

36.     Also as part of this partnership arrangement, ACI and BEI agreed that once Lance decided to retire – which he represented he would do upon turning seventy years old – ACI would have the right of first refusal to acquire BEI and/or its assets.[5] (Trial Tr. at 280:13-15; 286:16-287:3; 291:7-15 (J. Caldwell); *see also* 467:22-468:4 (M. Ladiana).)

37.     ACI paid BEI for their inventory pursuant to the partnership arrangement until July 12, 2013, when BEI (pursuant to a directive by Lance) instructed ACI to cease selling BEI inventory, and ACI complied with that instruction.  (Trial Tr. 61:21-24 (L. Beiner), 275:17-276:13 (B. Gonzalez); 299:5-300:10 (J. Caldwell).)

38.     ACI and BEI never agreed not to compete with one another upon termination of the partnership.  (Trial Tr. 282:22-283:10 (J. Caldwell).)

---

acted as BEI's agent (*see* Trial Tr. at 493:8-14 (BEI closing argument)) is not persuasive.  Neither Lance nor BEI had any ownership interest in ACI, and, as discussed more fully below, any control Lance exercised the over ACI's business operations was consistent with the ACI-BEI partnership structure.  *See infra* Factual Finding No. 52.

[5] Lance's testimony to the contrary (*see infra* Factual Finding No. 39-42) is entitled to little evidentiary weight, as it is self-serving and contradicted by the trial testimony of several other witnesses.

7.

1
2

**b.      Purported agreement between Lance and Adam**
**regarding control over ACI**

3       39.     According to Lance, around the time that Adam incorporated ACI (and
4  before the incorporation of BEI), Adam and Lance agreed that Lance would exercise
5  complete control over ACI unless and until Lance unexpectedly died and/or became
6  incapacitated, at which time Adam would take over the company.  (Trial Tr. at 45:4-
7  18 (L. Beiner).)

8       40.     Adam never discussed any such agreement with Jennifer, who had been
9  married to Adam for approximately 5 years at the time Lance and Adam purportedly
10 entered into this agreement.  (Trial Tr. at 279:9-14, 285:9-14 (J. Caldwell).)

11      41.     Adam is now deceased and cannot testify regarding the scope of any
12 agreement with Lance.  (Trial. Tr. at 279:21-22 (J. Caldwell).)

13      42.     To the extent any such agreement existed between Lance and Adam, the
14 agreement was between Lance (as an individual) and Adam and/or ACI, and the
15 agreement's terms did not include any term that allowed Lance to exercise complete
16 control over ACI and its business operations.[6]

17
18
19

**c.      In furtherance of the partnership agreement, ACI**
**and BEI exercised joint control over the partnership**
**business enterprise**

20

21  _____

        [6] The Court finds that Lance's testimony to the contrary is entitled to little
22  evidentiary weight.  Lance's testimony is entirely self-serving and contradicted by the
    weight of the evidence that BEI and ACI were engaged in a partnership pursuant to
23  the terms described above.  *See infra* Factual Finding Nos. 43-52.  Lance's testimony
24  that he (either personally or on behalf of BEI) had a right to exercise control over ACI
    is also contracted by the fact that Lance could not sell ACI's assets to All Current
25  absent Jennifer's permission and cooperation.  *See infra* Factual Finding Nos. 76.
    Finally, the Court finds it, generally, incredible that either Adam or Jennifer would
26  have agreed to assume the financial and business risk/liability as owners and sole
    shareholders of ACI while at the same time agreeing to relinquish all control over the
27  corporation.
28

43.     ACI and BEI exercised joint control over the business enterprise, jointly participating in the profits, losses, and management of the partnership.  For example, ACI personnel, including Adam, Jennifer and Michael Ladiana, engaged in the purchase of electric motor parts on BEI's behalf (and as a result, ACI has always had business relationships with vendors).  ACI and BEI collaborated in decisions affecting both companies, such as hiring and firing decisions, scheduling, the purchase of inventory, and related matters, and ACI and BEI were privy to each other's customer and vendor lists.  (Trial Tr. at 283:23-284:9; 284:22-285:5; 362:11-363:1 (J. Caldwell); 426:9-427:5 (B. Gonzalez); 465:18-466:21 (M. Ladiana); Ex. 112.)

44.     Despite exercising joint control over the business enterprise, ACI and BEI were separately owned.  In this regard, Adam held himself out as the exclusive owner of ACI during his tenure.  ACI bore the brunt of the day-to-day efforts in operating the enterprise and the brunt of the business risk.  (Trial Tr. at 284:7-21 (J. Caldwell); *see also* 465:18-466:21 (M. Ladiana).)

45.     For example, ACI paid for all the office equipment and furniture used in the partnership, including the shelving at ACI and BEI's leased warehouse and office space.  (Trial Tr. at 230:19-22 (L. Beiner); 430:23-431:3 (B. Gonzalez).)

46.     ACI has paid and continues to pay for the maintenance of B&B Electric Sales' website domain, abplace.com.[7]  (Trial Tr. at 230:23-25 (L. Beiner); 430:17-22 (B. Gonzalez).)

47.     ACI pays for the health insurance provided to its employees.  (Trial Tr. at 429:23-430:9 (B. Gonzalez).)

---

[7] Lance testified that the B&B Electric Sales website, abplace.com, listed Lance as the owner and president of the company from approximately 1997 through 2008. (*see* Trial Tr. at 42:18-43:14 (L. Beiner).)  This testimony is insignificant and, at most, indicates that Lance was listed on the website as owner and president as a result of ACI's inattention in maintaining the website.

1    48.    ACI pays for the 401K plan provided to its employees.  (Trial Tr. at

2    430:10-16 (B. Gonzalez).)

3    49.    When an employee of ACI brought an unemployment insurance claim

4    against ACI, it was ACI's unemployment fund that was tapped when the claim was

5    resolved against ACI.  (Trial Tr. at 231:1-17 (L. Beiner).)

6    50.    Additionally, both Adam and Jennifer were and continue to be

7    responsible for filing income tax returns on behalf of ACI (Trial Tr. at 27:14-29:3 (S.

8    Freeman)), as well as keeping ACI's corporate minutes during their respective tenures

9    as president and sole shareholder over ACI.  (Trial Tr. at 292:5-295:11 (J. Caldwell),

10   Ex. 41.)

11   51.    Through July 12, 2013 and pursuant to the above-described partnership

12   arrangement, ACI's revenues were exclusively the result of sales of inventory

13   purchased from BEI.  The partnership arrangement, however, does not change the fact

14   that ACI was and continues to be responsible for the expenses described above, *e.g.*,

15   office equipment, furniture, shelving, leased office and warehouse space, and the

16   website domain name.

17   52.    Indeed, Adam and Jennifer (during their respective tenures as president

18   and sole shareholder of ACI) often looked to Lance (as president and sole shareholder

19   of BEI) for guidance in operating the business and in making certain business

20   decisions, including salary determinations.  This, however, was consistent with the

21   partnership agreement between the companies because, for example, any ACI salary

22   increases would cut into BEI's special markup payments, payments that operated as

23   the agreed-upon quid pro quo for ACI's right to purchase BEI and/or its assets upon

24   Lance's retirement.[8]  (See 349:10-25, 363:2-10 (J. Caldwell).)

25   _____

26        [8] In this regard, it is unremarkable that Lance (whether in his personal capacity
27   or on behalf of BEI) reimbursed Adam and Jennifer for their incurred personal tax
     liability stemming from ACI's retained earnings.  (*See* Trial Tr. at 77:16-78:22 (L.
28   Beiner); Ex. 23.)  To the extent Lance reimbursed Adam and Jennifer in his personal

10.

1    **E.    Prophet 21**

2        53.    In 2010, ACI purchased Prophet 21 using its own revenue.[9]  (Trial Tr. at

3    423:424:5 (B. Gonzalez); see also Ex. 111.)

4        54.    ACI has always depreciated and continues to depreciate Prophet 21 on its

5    income taxes.  (Trial Tr. at 229:20-24 (L. Beiner).)

6        55.    ACI set up Prophet 21 so that it had two "sides."  ACI's side was

7    designated as "BBB," and BEI side was designated as "WAS."  (Trial Tr. at 149:1-10

8    (L. Beiner); 271:14-22 (B. Gonzalez).)

9        56.    The BBB (ACI) side of Prophet 21 contained ACI's accounts

10    receivables, accounts payables, sales orders, the general ledger, and the "Assemblies

11    Database."  The WAS (BEI) side of Prophet 21 contained the purchase order module

12    and the inventory module, including minimum and maximum inventory amounts.

13    (Trial Tr. at 425:15-24 (B. Gonzalez).)

14        57.    The Assemblies Database contained information regarding parts

15    available in the inventory that could be used to assemble various electric components,

16    and ACI used the database as a sales tool.  (Trial Tr. at 288:1-18 (J. Caldwell).)

17        58.    Though BEI did not use the Assemblies Database (Trial Tr. at 425:25-

18    426:1 (B. Gonzalez)), BEI had full access to the entire Prophet 21 system, *i.e.*, both

19    the BBB and WAS sides, until July 2013.  (Trial Tr. at 148:2-11.)

20

21

---

22    capacity, this fact is immaterial to the issues in this case because Lance (the
individual) is not a party to this litigation.  To the extent Lance reimbursed Adam and

23    Jennifer on behalf of BEI (there is no evidence that BEI incurred this liability), it is

24    consistent with the general partnership structure that ACI paid BEI the special markup
only *after* deducting operating expenses, as Adam and Jennifer's personal tax liability

25    resulting from ACI's retained earnings can be perceived as ACI "operating" expenses.

26        [9] Again, it is irrelevant that, at the time, ACI's revenue was exclusively from

27    sales of inventory purchased through BEI, as this arrangement was a function of the
partnership structure.

28

59.     Because BEI and ACI are two separate entities, each with their own federal employer identification numbers, the companies separately maintained their financial books, including any related information on their respective Prophet 21 "side." (Trial Tr. at 424:19-425:14 (B. Gonzalez).)

**F.     Transfer of ACI to Jennifer**

60.     In 2011, Adam and Jennifer divorced and divided their assets equally. (AF 14; Trial Tr. at 279:13-18; 289:6-10 (J. Caldwell).)

61.     In November 2011, as part of their divorce settlement, Adam turned over all of his ACI shares to Jennifer, thus making Jennifer the sole shareholder of ACI and its legal owner.[10]  (Trial Tr. at 279:19-20 (J. Caldwell); Ex. 40.)

62.     Adam placed no restrictions on ACI's shares, *i.e.*, there was no requirement that Lance or BEI had complete control over ACI, and there was no requirement that Jennifer was obligated to sell ACI should Lance and/or BEI demand that she do so.  (See Ex. 40; Trial Tr. at 285:6-14; 290:4-291:6; 323:1-324:6 (J. Caldwell).)

63.     Jennifer understood that as part of Adam transferring his ACI shares to her, Adam was also transferring his ownership rights in the trade name B&B Electric Sales.  (Trial Tr. at 282:22-283:18; 360:24-361:3 (J. Caldwell).)

64.     In fact, in an email dated October 18, 2013, Lance concedes that "B&B [Electric Sales] is owned by [Jennifer] legally."  (Ex. 81.)

65.     When Jennifer received the ACI shares, ACI and BEI's business partnership structure remained the same as it was during Adam's tenure as president and sole shareholder of ACI.  *See supra* Factual Findings Nos. 34-38.

---

[10] Lance's trial testimony that Adam transferred the ACI shares to Jennifer pursuant to Lance's direction, following objection by counsel for Defendants and Cross-Claimants ACI and Jennifer, was not offered for the truth, and therefore the Court does not consider it for purposes of the instant Factual Findings.  (Trial. Tr. at 90:5-92:20 (L. Beiner).)  Even if it had been offered for the truth, the Court deems the testimony irrelevant to these Factual Findings.

66.     Specifically, when Jennifer received the ACI shares, she understood that pursuant to ACI and BEI's partnership agreement, and in exchange for the special markup payment arrangement (described above), Lance would either turn over or sell BEI to ACI when he decided to retire, and the two companies would become combined under one owner.  Jennifer also understood that ACI's opportunity to purchase and combine with BEI would have been available to Adam (as ACI's owner and sole shareholder) but for Adam and Jennifer's divorce, and Lance represented the same to Jennifer at the time she received ACI's shares.  (Trial Tr. at 280:13-15; 286:16-287:3; 291:7-15 (J. Caldwell); *see also* 467:22-468:4 (M. Ladiana).)

67.     Jennifer, like Adam, treated ACI as a true owner would; for example, she learned to read and understand the financial statements.  Though she collaborated with Lance on certain issues, such as personnel decisions, she held herself out to be the owner of ACI.  (Trial Tr. at 291:16-292:13 (J. Caldwell).)

68.     As stated above, Jennifer also filed income tax returns on behalf of ACI and kept the corporate minutes of ACI.  (Trial Tr. at 27:14-29:3 (S. Freeman); 292:5-295:11 (J. Caldwell); Exs. 41, 95.)

69.     In April 2012, ACI and BEI leased new office and warehouse space located on Transport Street in Ventura County, and both ACI and BEI were signatories to the lease for the premises.  (See Ex. 83.)

**G.     Asset-Purchase Sale to All Current**

**a.     BEI receives an initial inquiry from All Current**

70.     In early 2013, Lance decided to retire.  (Trial Tr. at 101:2-102:7 (L. Beiner).)

71.     In May 2013, ACI employee Michael Ladiana went to Lance's home in Washington state at Lance's request so that Lance could be sure that he (Ladiana) knew how to handle the inventory when Lance retired and when BEI was turned over to ACI.  (Trial Tr. at 469:13-470:4; 477:6-23 (M. Ladiana); see also 104:7-105:8 (L. Beiner).)

72.     While Mr. Ladiana was working out of Lance's home in Washington state, Lance received a telephone call from the representative of an ACI competitor, All Current Electric ("All Current"), which informed Lance that it was interested in purchasing the assets of BEI and ACI.  (Trial Tr. at 103:1-104:6 (L. Beiner); 470:5-471:6 (M. Ladiana).)

73.     Thereafter, Lance began negotiating an asset sale of BEI and ACI with All Current.  During those negotiations, Lance provided All Current with confidential information regarding ACI, including its financial statements for January through May 2013, a partial list of ACI's customers, and ACI's sales by state for certain years. (Trial Tr. at 217:11-218:11; 218:21-221:15 (L. Beiner); 306:10-307:10 (J. Caldwell); Trial Exs. 53, 54, 55, 59, 60.)

74.     Lance informed All Current about the partnership with ACI, informing All Current that ACI controlled the trade name B&B Electric Sales and the ACI customer list.  (Trial Tr. at 218:12-20 (L. Beiner); Exs. 55, 81.)

75.     Lance never disclosed to Jennifer that he was negotiating on behalf of ACI or that he was providing All Current with ACI's confidential information.  (Trial Tr. at 220:13-221:15 (L. Beiner).)

**b.     Lance notifies Jennifer of All Current's interest in an asset sale**

76.     In June 2013, Lance informed Jennifer that he wished to sell BEI and ACI's assets to All Current and asked for Jennifer's cooperation as the owner of ACI. (Trial Tr. at 295:12-298:1 (J. Caldwell).)

77.     On July 3, 2013, All Current provided Lance with a written offer to purchase BEI and ACI's assets for, collectively, $5.8 to $6.8 million, contingent on All Current's satisfaction with its due diligence investigation and the negotiation of deal documentation.  (Trial Tr. 126:8-12, 128:6-20, 129:19-130:6 (L. Beiner); Ex. 63.)

78.     Lance felt that All Current's offer was one he could not refuse.  (Trial Tr. at 129:2-11 (L. Beiner).)

14.

79.     In early July 2013, after receiving All Current's offer, Lance and Jennifer again discussed the sale of BEI and ACI's assets to All Current.  At that time, Jennifer indicated that she would accept $3,500,000 for ACI's assets, and Lance responded that that price was too high.  The parties agreed to talk again the following week. (Trial Tr. at 298:2-18 (J. Caldwell).)

80.     Lance and Jennifer subsequently discussed Jennifer's interest in purchasing BEI's assets in lieu of the ACI and BEI asset sale to All Current.  Lance explained to Jennifer that All Current was offering all cash, and Jennifer could not pay all cash for the BEI assets, which Jennifer did not dispute.  (Trial Tr. at 104:23-105:1-5, 131:7-23 (L. Beiner).)

81.     Jennifer informed Lance that she would accept $2,500,000 (the equivalent of $125,000 annual salary for 20 years) for the sale of ACI's assets to All Current.  Lance replied that her offer was "not even close" and countered with $500,000.  Lance considered the counteroffer a "bonus" to compensate Jennifer for her cooperation and for her service and loyalty toward Lance.  Lance and Jennifer did not reach an agreement.  (Trial Tr. at 123:2-124:11 (L. Beiner); 298:19-299:4 (J. Caldwell).)

### c.     BEI directs ACI to cease selling BEI inventory

82.     On Friday, July 12, 2013, Lance orally instructed Jennifer that ACI was to cease selling BEI's inventory unless and until an agreement could be reached. Jennifer ceased selling BEI's inventory effective Monday, July 15, 2013 pursuant to this directive.  (Trial Tr. at 275:17-276:13 (B. Gonzalez); 299:5-300:10 (J. Caldwell).)

83.     On July 14, 2013, Jennifer informed ACI's employees about the disagreement regarding the sale of BEI and ACI's assets to All Current.  She instructed the employees that they were not to sell any more of BEI's inventory until further notice.  However, hopeful that BEI and ACI would reach agreement, Jennifer instructed her employees to continue to take orders but to inform the customers that

ACI's computers had crashed, and the material could not ship immediately. (Trial Tr. at 300:11-301:11 (J. Caldwell).)

84.     On July 15 and 16, 2013, Lance again communicated to Jennifer that ACI should not sell any of BEI's inventory without his permission. (Trial Tr. at 223:12-20; 224:17-225:3 (L. Beiner); Exs. 65, 66, 67.)

85.     On July 16, 2013, Jennifer sent a letter to customers using B&B Electric Sales letterhead, explaining that B&B Electric Sales had been selling inventory that it had on consignment from a vendor, that the vendor had pulled the company's inventory, and that the company was working on acquiring new inventory. (Trial Tr. at 335:1-336:6 (J. Caldwell); Ex. 27.)

86.     Also on July 16, 2013, Lance met with ACI's office manager and bookkeeper, Becky Gonzalez, at a restaurant. Ms. Gonzalez also kept the books for BEI. Ms. Gonzalez brought certain financial statements for ACI and BEI that Lance had requested. (Trial Tr. at 444:15-19 (B. Gonzalez).)

87.     Based on his review of those financial statements, Lance asked Ms. Gonzalez to write out a BEI invoice to ACI for all of the money outstanding in ACI's accounts receivables, $535,042.48, and cash on hand, $43,454.66. (Trial Tr. at 444:20-445:19 (B. Gonzalez).)

88.     Ms. Gonzalez refused to prepare the BEI invoice because BEI had already been paid current for all of its inventory and special markup through July 12, 2013, and she knew of no other agreement between ACI and BEI that would permit BEI to claim 100 percent of ACI's accounts receivables and cash on hand. (Trial Tr. at 445:20-446:13 (B. Gonzalez).)

89.     Ms. Gonzalez, on behalf of ACI, paid BEI its special markup through July 15, 2013. The amount of the special markup was determined by calculating the average of the special markup on gross sales from January through June 2013, converting that to a percentage of gross sales, and applying that percentage to gross sales between July 1 and July 15, 2013. Though this was a variation on ACI and

BEI's payment procedures under the partnership structure, Ms. Gonzalez had no choice but to calculate the payment this way because there was no established method for calculating the special markup payment in the middle of the month. (Trial Tr. at 436:3-437:4 (B. Gonzalez).)

90. ACI paid the last remaining balance owed to BEI under the special markup arrangement – for ACI's sales through July 12, 2013 – on or before July 20, 2013. (Trial Tr. at 436:3-437:20 (B. Gonzalez).)

### d. **Lance and Jennifer resume negotiations regarding the ACI and BEI asset sale to All Current, but they are unable to reach an agreement**

91. While Lance continued to ask Jennifer to propose a resolution to the parties' disagreement, Lance made clear to Jennifer that he was not prepared to accept any offer except either (1) a sale of ACI's assets to All Current pursuant to the terms already negotiated; or (2) a continuation of the parties' previous arrangement where BEI sold its inventory to ACI at cost plus a special markup. In other words, Jennifer and ACI had no meaningful ability to negotiate with BEI. (Trial Tr. at 225:4-12; 479:18-482:2 (L. Beiner); Ex. 64).

92. On July 30, 2013, Lance asked Jennifer to continue to sell BEI's inventory under the previously existing partnership arrangement. Jennifer did not respond to Lance's request. (Ex. 65.)

93. In a final attempt to obtain Jennifer's cooperation and salvage a deal with All Current, Lance asked All Current to make a joint offer. On August 2, 2013, All Current made a joint offer to BEI and ACI in the form of a letter of intent ("LOI"). This LOI offered to purchase ACI and BEI's assets for $6 million, with $4 million paid to BEI and $2 million paid to ACI for their respective business assets. (Trial Tr. at 145:1-10 (L. Beiner), 308:21-309:3 (J. Caldwell); Ex. 30.)

94. The LOI also included the requirement that Jennifer, as owner of ACI, sign a five-year agreement not to compete with All Current. (Ex. 30.)

95.     No guarantee existed that either ACI or BEI would receive the purchase amounts listed in the LOI because the offer was subject to All Current's due diligence (Trial Tr. at 227:22-228:7 (L. Beiner)), among other contingencies.

96.     Jennifer rejected All Current's offer presented in the LOI because, among other reasons, the LOI contained a contingency that Jennifer deemed unreasonable. The contingency required ACI meet certain sales goals per month ($480,000) through closing of the deal.  Because ACI had grossed that sales amount only once in the preceding seven months, Jennifer considered the contingency unreasonable.  (Trial Tr. at 309:4-312:19 (J. Caldwell); Exs. 30, 126, 129, 135 at Schedule 3.)

97.     As Lance admits, the asset-purchase sale of ACI to All Current was not in ACI's best interest.  (Trial Tr. at 217:8-10 (L. Beiner).)

98.     Lance also admits that had Jennifer accepted All Current's $2 million asset-purchase offer on behalf of ACI, and had the sale to All Current had gone through pursuant to the terms of the LOI, then Lance never would have brought the instant lawsuit against ACI and Jennifer.  (Trial Tr. at 227:2-5 (L. Beiner).)

### e.     BEI interferes with ACI's business dealings

99.     After BEI directed ACI to cease selling BEI inventory, ACI began efforts to acquire inventory from vendors on its own based on its ongoing relationships with such vendors.  *See supra* Factual Finding Nos. 43s.

100.    During this time, before the BEI asset sale to All Current, Lance had telephone conversations and sent emails to Vendors A, B, and C[11] (which previously sold inventory to BEI and with which ACI had independent business relationships), asking these vendors to <u>not</u> sell any inventory to ACI because Lance did not want ACI to have the ability to purchase material from a company that Lance considered a BEI

---

[11] In light of the Court's conclusions that ACI's vendor and customer lists constitute trade secrets (*see infra* Conclusions of Law Nos. 114-117), the relevant vendors shall are referred to as Vendor A, Vendor B, and Vendor C on the public record.

vendor.  (Trial Tr. at 314:3-15 (J. Caldwell); 484:8-488:3 (L. Beiner); Exs. 72, 73, 81.)

101.   As a result, Vendors A, B, and C – vendors that had previously done business with B&B Electric Sales vis-à-vis ACI and BEI's partnership – stopped doing business with ACI.  Upon deciding to resume business with ACI, these vendors required ACI to pay for all merchandise up front and by credit card (this requirement is sometimes referred to as Cash on Delivery, or COD), which hinders ACI's ability to purchase sufficient inventory to fulfill all of its orders.  (Trial Tr. at 314:14-316:1 (J. Caldwell).)

### f.   BEI asset sale to All Current

102.   On September 10, 2013, the BEI asset sale to All Current closed.  (See Ex. 77.)

103.   All Current paid BEI a total of $3,019,378.  (See Ex. 79; Trial Tr. at 152:13-20, 156:9-158:3 (L. Beiner); Ex. 78.)

104.   The contract with All Current also included an "earn out" clause.  That is, All Current agreed that if it could issue purchase orders from a certain vendor, Vendor A, that totaled $300,000 over a specified period of time after the deal closed, then All Current would pay BEI an additional $500,000.  (Trial Tr. at 152:15-20, 153:24-154:6; Ex. 77 at Article 2, ¶ 2.1(b)(i) (page 4).)

105.   All Current was only able to issue purchase orders from Vendor A in the amount of $222,937.16 over the designated "earn out" period, and so All Current paid BEI only $371,561.93 – the pro rata calculation for the amount available in the earn out" agreement.  (See Ex. 78.)

106.   ACI did not interfere with BEI's ability to procure $300,000 in purchase orders from Vendor A.  (Trial Tr. at 313:3-17 (J. Caldwell).)  BEI adduced no evidence at trial that ACI interfered with Vendor A or BEI's ability to complete the "earn out."  To the extent BEI relies on the fact ACI purchased inventory from Vendors A, B, and C after July 12, 2015, this evidence is irrelevant because the ACI-

1    BEI partnership had no agreement not to compete in the case either company

2    disassociated from the partnership.  *See supra* Factual Finding No. 38.

3    **H.    ACI No Longer Has Access To BEI's Inventory Or Data**

4        107.   During July and August 2013, Becky Gonzalez, on behalf of ACI,

5    worked with a Prophet 21 vendor to separate BEI's inventory data from ACI's sales

6    data, including the minimum and maximum inventory data, in the Prophet 21 system.

7    (Trial Tr. 427:6-428:18 (B. Gonzalez).)

8        108.   ACI removed BEI's data from the WAS side of Prophet 21 and provided

9    that data to BEI, after which ACI has not had access to any of the data on the WAS

10   side of Prophet 21.  (Trial Tr. at 428:19-429:8 (B. Gonzalez).)

11       109.   ACI provided the data to Lance on a memory stick, but Lance never

12   reviewed the data to determine the scope of what BEI received.  (Trial Tr. at 230:5-18

13   (L. Beiner).)

14       110.   BEI also obtained all of its inventory material from the Transport Street

15   location as part of the asset sale to All Current.  (Trial Tr. at 316:2-21 (J. Caldwell).)

16       111.   Neither Lance nor BEI have occupied the Transport Street location since

17   the BEI inventory was moved out of the facility, which occurred in September and

18   October 2013, and since then BEI has never attempted to access or occupy the

19   Transport Street location.  (Trial Tr. at 166:24-167:1 (L. Beiner).)

20                          **CONCLUSIONS OF LAW**

21   **I.    Jurisdiction**

22       112.   Jurisdiction is based on diversity of citizenship.  28 U.S.C. § 1332.

23   Plaintiff and Counter-Defendant BEI is a citizen of Washington state, and Defendants

24   and Counter-Claimants ACI and Jennifer are citizens of California.  (Dkt. No. 95 at 8

25   (Uncontested Facts Nos. 1, 6, 10); Trial Exs. 34, 127.)  The amount in controversy

26   exceeds $75,000.

27       113.   The Court also has federal question jurisdiction pursuant to 28 U.S.C.

28   §§ 1331 because BEI asserts a claim under § 43 of the federal Lanham Act, 15 U.S.C.

1    § 1125(a), and there is supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with
2    respect to the parties' common law and state law claims.

3    **J.    Identification Of Vendors And Customer Lists**

4          114.   In judicial proceedings dealing with trade secrets, Cal. Civ. Code
5    § 3426.5 provides that the court "shall preserve the secrecy of an alleged trade secret
6    by reasonable means, which may include . . . sealing the records of the action."
7    Customer and vendor lists may be provided protection under the CUTSA if it can be
8    shown that the lists derive economic value by not being generally known to the public
9    and the owner of those lists has taken pains to keep them secret. *Norsat Int'l v. BIP*
10   *Corp.*, 12-cv-674, 2014 WL 2453034, *6 (S.D. Cal. May 30, 2014). The parties have
11   presented sufficient evidence to satisfy these elements, and the parties have stipulated
12   to the same.

13         115.   ACI has an ownership interest in the vendor and customer lists trade
14   secrets, as the company has, on its own, developed relationships with its vendors and
15   customers.

16         116.   ACI (and BEI, when BEI was an active corporation and a member of the
17   ACI-BEI partnership) maintained the secrecy of their vendors because if it did not,
18   any vendor that was discovered risked its franchise being discontinued by the
19   manufacturer. Additionally, there is intense competition in the electric motor parts
20   gray market for customers. As a result, ACI keeps its vendor and customer lists secret
21   and does not share them with any other entity (save for BEI during the existence of
22   their partnership). ACI's employees are instructed to keep the vendor and customer
23   lists secret, and the vendor and customer lists derive economic value. *See Citizens of*
24   *Humanity, LLC v. Costco Wholesale Corp.*, 171 Cal. App. 4th 1, 13-14 (2009)
25   disapproved of on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310
26   (2011).

27         117.   Accordingly, the Court finds that ACI's vendor and customer lists
28   constitute trade secrets, and it is appropriate to protect the identities of the vendors and

1    customers to the extent they are relevant to the issues in this trial.  The relevant

2    vendors shall be referred to as Vendor A, Vendor B, and Vendor C on the public

3    record.  Customer names shall not be identified at all in the public record.

4    **K.    BEI's Claim For Breach Of Contract**

5         118.   BEI's claim for breach of contract is premised on the fact that BEI and

6    ACI had an agreement whereby ACI acted as the sales agent of BEI and that ACI's

7    operations remained in BEI's exclusive control (including BEI's exclusive right to sell

8    ACI and/or its assets without ACI's consent) unless and until Lance died or became

9    suddenly incapacitated.  Because ACI and BEI did not agree to an agency relationship

10   as described above, BEI's claim for breach of contract fails.

11        119.   Additionally, though Jennifer is ACI's principal and acts on ACI's

12   behalf, she owes no separate contractual duty to BEI as a result of the ACI-BEI

13   partnership, and BEI has not otherwise established that ACI's corporate veil should be

14   pierced such that Jennifer should be personally liable for any wrongful conduct by

15   ACI.

16                  **a.    ACI's refusal to cooperate in the asset sale to All**

17                         **Current**

18        120.   ACI and BEI entered into an oral partnership agreement, and the

19   partnership lasted from approximately 2005 through July 12, 2013 at the close of

20   business, upon Lance's instruction that ACI cease selling BEI inventory, and ACI's

21   compliance with that instruction.  *See* Cal. Corp. Code §§ 16601(1), 16602.

22        121.   The partnership agreement, when it was in effect, included no such term

23   that BEI had the right to exclusive control over ACI's operations or the right to sell

24   ACI and/or its assets without ACI's consent.

25        122.   Further, the terms of a partnership agreement may not eliminate the

26   duties of loyalty, care, or good faith and fair dealing between partners.  Cal. Corp.

27   Code § 16103(b)(3), (4), & (5).  Thus, the scope of the parties' partnership agreement

28   could not have given BEI the right to exclusive control over ACI's operations,

1    including the right to sell ACI without its consent, under terms that were not in ACI's

2    best interest.

3         123.   Because ACI and BEI's partnership agreement did not include a term that

4    allowed BEI the right to sell ACI without its consent, and to the extent BEI's claim for

5    breach of contract is premised on the partnership agreement, BEI's claim for breach of

6    contract on this ground fails.

7         124.   Moreover, any agreement between Lance (as an individual) and Adam

8    and/or ACI that Lance or BEI would have the right to exclusive control over ACI's

9    operations does not change the analysis.  Lance (as an individual) is not a party to this

10   litigation, and therefore he cannot seek to enforce such a purported agreement in this

11   lawsuit.

### b.   BEI's directive and ACI's compliance with the directive to cease sale of BEI inventory

14        125.   BEI also argues breach of contract on the grounds that ACI ceased selling

15   BEI's inventory as of July 15, 2013, that ACI failed to remit all monies owed to BEI

16   under the partnership structure, and that ACI refused to return to BEI other intangible

17   business assets.  Each of these arguments fails.

18        126.   California contract law requires that a plaintiff "who seeks to enforce a

19   contract must show that he has complied with the conditions and agreements of the

20   contract on his part to be performed."  *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010

21   (9th Cir. 2005) (citations omitted); *see also* California Civil Code § 1439.  BEI was in

22   breach of ACI and BEI's partnership agreement, which required BEI to sell its

23   inventory to ACI.  BEI instructed ACI to cease selling BEI inventory effective July

24   12, 2013 at the close of business, and ACI complied with that instruction.  Thus,

25   ACI's performance was excused, and BEI's claim for breach of contract on the ground

26   that ACI ceased selling BEI's inventory fails.

27        127.   According to the evidence adduced at trial regarding the parties' course

28   of conduct, BEI failed to establish that it was entitled to anything more than its costs

1   of goods sold and special markup for sales through the close of business on July 12,

2   2013.  Because the evidence established that ACI did in fact pay BEI the money to

3   which it was entitled under the partnership agreement, BEI's claim for breach of

4   contract fails on the ground that ACI failed to remit all monies owed to BEI under the

5   partnership structure.

6   128.   Also according to the evidence adduced at trial, BEI failed to establish

7   that it "loaned" ACI any intangible assets, such as the trade name B&B Electric Sales.

8   ACI is the ostensible owner of the trade name B&B Electric Sales: ACI registered the

9   trade name, and the registration recognizes that ACI began using the trade name in

10   2004, before BEI came into existence.  BEI has offered no evidence that it ever used

11   the trade name B&B Electric Sales or that it is otherwise has an ownership interest in

12   the trade name.  To the extent the trade name was contractually "loaned" from Beiner,

13   Inc. to ACI, Beiner, Inc. (which dissolved and ceased to exist in December 2005) is

14   not a party to this litigation, and BEI has no standing to assert a breach of contract

15   claim on Beiner, Inc.'s behalf.  *See* Fed. R. Civ. P. 17(a) ("An action must be

16   prosecuted in the name of the real party in interest."); *Martin v. Bridgeport Cmty.*

17   *Ass'n, Inc.*, 173 Cal. App. 4th 1024, 1031-32 (2009) ("A real party in interest is one

18   who has an actual and substantial interest in the subject matter of the action and who

19   would be benefited or injured by the judgment in the action.") (citation and internal

20   quotation marks omitted).  Thus, BEI's claim for breach of contract on the ground that

21   ACI failed to return contractually "loaned" intangible assets also fails.

22   129.   Because BEI has failed to establish any claim for breach of contract, BEI

23   is not entitled to any damages under this claim for relief.

24   **L.   BEI's Claim For Breach Of Fiduciary Duty**

25   130.   BEI claims that ACI and Jennifer breached their fiduciary duties of

26   loyalty and care to BEI by retaining assets and money belonging to BEI, by seizing

27   control of the ACI business, and by refusing to cooperate in the ACI asset sale to All

28   Current.

24.

131.   As stated above, ACI was not an agent to BEI.  Rather, ACI and BEI were partners, and therefore they owed each other and the partnership the fiduciary duties of loyalty and care.  *See* Cal. Corp. Code § 16404.  While Jennifer is ACI's principal and acts on ACI's behalf, she owes no separate fiduciary duty to BEI as a result of the ACI-BEI partnership, and BEI has not otherwise established that ACI's corporate veil should be pierced such that Jennifer should be personally liable for any wrongful conduct by ACI.

132.   ACI has not retained any assets or money belonging to BEI.  ACI has paid BEI all monies owed to it for the costs of BEI's goods sold and special markup for sales through the close of business on July 12, 2013.  Additionally, BEI has no ownership interest in the B&B Electric Sales trade name or any other intangible asset ostensibly owned by ACI.  Thus, BEI's claim for breach of fiduciary duty on the ground the ACI has retained assets and money belonging to BEI fails.

133.   BEI does not have (and never has had) any ownership rights in ACI, and BEI does not have (and never has had) any contractual rights to exercise exclusive control over ACI's operations.  Thus, BEI's claim for breach of fiduciary duty on the ground that ACI and/or Jennifer "seized" control of the ACI business fails.

134.   BEI had no right to sell ACI without ACI's consent and cooperation, and the proposed sale of ACI's assets to All Current was not in ACI's best interest.  Thus, ACI could not have breached any fiduciary duty to BEI when it refused to consent to and cooperate in the asset sale to All Current, and BEI's claim for breach of fiduciary duty on these grounds fails.

135.   To the extent BEI claims a breach of fiduciary duty based on ACI's failure to sell BEI inventory following July 12, 2013 at the close of business, this claim also fails.  BEI instructed ACI to cease selling BEI inventory effective July 12, 2015 at the close of business, and ACI could not have breached any fiduciary duty to BEI by complying with that instruction.

136.   Because BEI has failed to establish any claim for breach of fiduciary duty, BEI is not entitled to any damages under this claim for relief.

**M.   BEI's Claim For Violation Of The Lanham Act**

137.   BEI claims that ACI violated the Lanham Act because ACI used BEI's purported trade name (B&B Electric Sales) in connection with its goods and services; ACI's use of the trade name is likely to cause confusion, mistake, or deception in the marketplace as to ACI's affiliation, connection, or association with BEI and/or its products; and as a result, BEI suffered damage.

138.   ACI owns the trade name B&B Electric Sales.

139.   ACI has been doing business under the trade name B&B Electric Sales since 2004, the same year indicated on ACI's registered Fictitious Business Name Statement.

140.   BEI concededly has never done business under the trade name B&B Electric Sales, and BEI concededly does not otherwise have a protectable ownership interest in the trade name B&B Electric Sales.

141.   Because BEI does not own the trade name B&B Electric Sales and has never done business under the trade name B&B Electric Sales, BEI cannot show (and did not otherwise establish at trial) that ACI's use of the trade name B&B Electric Sales is likely to cause confusion, mistake, or deception in the marketplace, or that ACI's use of the trade name B&B Electric Sales causes BEI to suffer any damages. Accordingly, BEI's claim under the Lanham Act with respect to ACI fails.

142.   For these reasons, BEI's claim under the Lanham Act with respect to Jennifer also fails.  This is aside from the fact that BEI offered no evidence at trial that Jennifer, in her personal capacity, used the trade name B&B Electric Sales in the market place.

1

**N.**     **BEI's Claim For Intentional Interference With Prospective Economic**

2          **Relations**

3          143.   BEI claims that ACI and Jennifer intentionally interfered with BEI's

4    prospective economic relations with respect to All Current's offers to purchase BEI's

5    assets, as described above.

6          144.   Assuming All Current's joint asset-purchase offer (as outlined in All

7    Current's August 2, 2013 LOI) constituted an actionable prospective economic

8    relationship between BEI and All Current, ACI's refusal to participate in the asset sale

9    was not independently wrongful.  ACI had no contractual or fiduciary duty to BEI to

10   participate in the asset sale to All Current, and ACI had no obligation to participate in

11   any business dealings that was not in its best interest.  While Jennifer is ACI's

12   principal and acts on ACI's behalf, she owes no separate contractual or fiduciary duty

13   to BEI as a result of the ACI-BEI partnership, and BEI has not otherwise established

14   that ACI's corporate veil should be pierced such that Jennifer should be personally

15   liable for any wrongful conduct by ACI.  Thus, BEI's claim for intentional

16   interference with prospective economic relations on this ground fails.

17         145.   To the extent BEI bases its claim for intentional interference with

18   prospective economic relations on ACI's purchase of inventory material from Vendor

19   A and All Current's inability to issue purchase orders to Vendor A totaling $300,000

20   during the specified earn out period, BEI's claim likewise fails.  The ACI-BEI

21   partnership did not include any agreement not to compete upon one partner's

22   disassociation from the partnership.  Thus, following BEI's disassociation from the

23   partnership, ACI's business dealings with Vendor A amounted to fair competition and

24   were not wrongful or otherwise actionable interference.

25         146.   Additionally, BEI offered no evidence at trial that ACI or Jennifer

26   otherwise engaged in any wrongful conduct that interfered with All Current's ability

27   to issue $300,000 worth of purchase orders during the designated earn out period.

28

27.

147.   Because BEI has failed to establish any claim for intentional interference with prospective economic relations, BEI is not entitled to any damages under this claim for relief.

**O.   BEI's Claim For Conversion**

148.   BEI claims that ACI converted money belonging to BEI when ACI retained possession of and failed to turn over the balance of its accounts receivables and cash on hand as of July 15, 2013.

149.   Pursuant to the parties' partnership agreement, ACI paid BEI its cost of goods sold and special markup for the sale of BEI's goods through July 12, 2013 at the close of business, at which time ACI ceased selling BEI's goods.

150.   The parties had no other agreement whereby BEI was entitled to ACI's accounts receivables and cash on hand above and beyond BEI's cost of goods sold and special markup, and BEI offered no evidence that it otherwise owned or was entitled to ACI's accounts receivables and cash on hand.

151.   Thus, ACI's retention and refusal to turn over its accounts receivables and cash on hand could not have interfered with BEI's purported property interest in the accounts receivables and cash on hand, and BEI's claim for conversion fails.

152.   Because BEI has failed to establish any claim for conversion, BEI is not entitled to any damages under this claim for relief.

**P.   BEI's Claim For Declaratory Relief**

153.   BEI seeks declaratory relief on its right to joint possession of the leased premises at the Transport Street location in Ventura County, California.[12]  BEI is not

---

[12] BEI appears to have abandoned its claims for declaratory relief that it is the rightful owner of all information and data contained in the Prophet 21 databases, that it is the rightful owner of ACI's accounts receivables and cash on hand effective July 15, 2013, and that it is the rightful and superior owner of the trade name B&B Electric Sales, as BEI provides no proposed conclusions of law in support of the same.  (*See* Dkt. No. 110.)  To the extent BEI has not abandoned these claims for declaratory relief, for the reasons discussed herein, the Court finds that these claims are meritless.

28.

1   entitled to declaratory relief because BEI failed to present evidence of an actual

2   controversy.

3       154.   While BEI is identified as a co-tenant on the Transport Street lease, BEI

4   has no property stored at the Transport Street location, and it has had no need to

5   access the Transport Street location since removing its property from the location in

6   October 2013 because BEI effectively ceased doing business upon completing the

7   asset sale to All Current.  BEI has not attempted to access the Transport Street

8   location since October 2013, and BEI presented no evidence at trial that it would need

9   to or seek to access the Transport Street location at any point in the future.

10      155.   Thus, BEI has failed to establish that the resolution of its declaratory

11  relief claim would, at this point, have any practical consequences, and so there is no

12  actual controversy relating to BEI's legal rights to joint possession of the Transport

13  Street location.  For this reason, BEI's claim for declaratory relief fails.

14  **Q.    ACI's Counterclaim For Breach Of Fiduciary Duty**

15      156.   ACI claims that BEI breached its fiduciary duties of loyalty and care to

16  ACI in conjunction with the asset sale negotiation to All Current.

17      157.   ACI and BEI were in a partnership from approximately 2005 through

18  July 12, 2013 at the close of business.  BEI dissociated itself from the partnership with

19  ACI upon instructing ACI to cease selling BEI inventory effective July 15, 2013.  *See*

20  Cal. Corp. Code §§ 16601(1), 16602.

21      158.   BEI's partnership fiduciary duties of loyalty and care to ACI continued

22  after dissociation with regard to matters that arose and events that occurred before the

23  dissociation, such as fulfillment of orders for electric motor parts and the winding up

24  of the partnership business.  *See* Cal. Corp. §§ 16404(c), 16603(3).

25      159.   BEI breached its partnership fiduciary duties of loyalty and care to ACI

26  when BEI negotiated the asset sale of ACI's assets to All Current (a competitor of

27  ACI) without informing ACI; provided All Current with confidential material related

28  to ACI, such as ACI's financial statements, partial customer list, and sales

29.

information; insisted that ACI agree to terms of an asset sale to All Current that were not in ACI's best interest; and instructed ACI to cease selling BEI inventory in violation of the partnership agreement.

**R.   ACI's Counterclaim For Intentional Or Negligent Interference With Prospective Business Advantage**

160.   ACI claims BEI intentionally or negligently interfered with its prospective economic interest when – after BEI disassociated from the partnership and while it was negotiating the asset sale to All Current – BEI contacted vendors and asked them not to do business with ACI.

161.   ACI had economic relationships with Vendors A, B, and C that would have probably resulted in an economic benefit to ACI, *i.e.*, ACI would have likely been able to purchase inventory material from these vendors and re-sell that material to customers.

162.   BEI had actual knowledge of these economic relationships; and BEI intentionally telephoned and emailed representatives of Vendors A, B, and C and asked them not to sell inventory to ACI, knowing that these efforts would have the effect of disrupting ACI's economic relationship with these vendors and, in turn, reducing ACI's sales.

163.   As a result of BEI's intentional conduct, ACI's economic relationships with Vendors A, B, and C were in fact disrupted.  These vendors altogether stopped doing business with ACI for a certain period of time, and upon resuming business with ACI, the vendors required ACI to purchase inventory under the COD method.

164.   Also as a result of BEI's intentional conduct, ACI suffered financial harm, and BEI's intentional conduct was a substantial factor in causing ACI's harm.

165.   Accordingly, BEI intentionally interfered with ACI's prospective business and economic interest.

1       Order re supplemental briefing on damages suffered by ACI and Jennifer

2 Caldwell to issue.

3

4       **IT IS SO ORDERED**.

5

6 Dated:  June 10, 2015                                         

7                            HONORABLE ANDRÉ BIROTTE JR.

                           UNITED STATES DISTRICT COURT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31.